**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0420-22

LIBERTY & PROSPERITY 1776
INC., a non-profit corporation of
New Jersey, JAMES MCLEAN, a
resident and taxpayer of Atlantic
City and Atlantic County, New
Jersey, KAREN BOREK and
JANIS HETRICK, residents and
taxpayers of Atlantic County,
New Jersey,

     Plaintiffs,

v.

CITY OF ATLANTIC CITY, a
municipality of New Jersey located
within Atlantic County, MARTY
SMALL, SR., Mayor of Atlantic City,
JACQUELYN SUAREZ,
Director of the Division of Local
Government Services, of the
Department of Community Affairs
of the State of New Jersey, THE
LOCAL FINANCE BOARD OF
THE STATE OF NEW JERSEY
and THE STATE OF NEW JERSEY,

     Defendants.

_____

COUNTY OF ATLANTIC, a body politic of the State of New Jersey, by and through DENNIS LEVINSON, the County Executive, THE CITY OF SOMERS POINT, a body politic of the State of New Jersey located within the County of Atlantic, THE TOWNSHIP OF HAMILTON, a body politic of the State of New Jersey located within the County of Atlantic, THE TOWNSHIP OF EGG HARBOR, a body politic of the State of New Jersey located within the County of Atlantic, THE CITY OF ABSECON, a body politic of the State of New Jersey located within the County of Atlantic, THE CITY OF VENTNOR, a body politic of the State of New Jersey located within the County of Atlantic, and the TOWNSHIP OF WEYMOUTH, a body politic of the State of New Jersey located within the County of Atlantic,

      Plaintiffs-Respondents,

v.

THE STATE OF NEW JERSEY, PHILIP D. MURPHY, in his official capacity as the Governor of the State of New Jersey, CITY OF ATLANTIC CITY, a municipal body of Atlantic County, MARTY SMALL, SR., Mayor of

2

Atlantic City, in his official capacity,
JACQUELYN SUAREZ,
Director of the Division of Local
Government Services of the
Department of Community Affairs,
LOCAL FINANCE BOARD OF
THE STATE OF NEW JERSEY,
a division of the New Jersey
Department of Community Affairs,
JEFFREY S. CHIESA, in his
official capacity as Emergency
Manager of the City of Atlantic City
and MATTHEW J. PLATKIN,
in his official capacity as the
Attorney General of the State of
New Jersey,

     Defendants-Appellants.

_____

Argued March 20, 2024 – Decided October 21, 2024

Before Judges Vernoia, Gummer, and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket Nos. L-0777-16 and L-1254-17.

Tim Sheehan, Deputy Attorney General, argued the cause for appellants (Matthew J. Platkin, Attorney General, and Chiesa Shahinian & Giantomasi PC, attorneys; Michael L. Zuckerman, Deputy Solicitor General, Kavin K. Mistry, Assistant Attorney General, Abiola G. Miles, Deputy Attorney General, Tim Sheehan, Deputy Attorney General, Victoria G. Nilsson, Deputy Attorney General, of counsel and on

the briefs; John Lloyd, Ronald L. Israel, and Brian P. O'Neill, on the briefs).

Ronald J. Riccio argued the cause for respondents (McElroy Deutsch, Mulvaney & Carpenter, LLP, attorneys; Ronald J. Riccio and Eliott Berman (McElroy Deutsch, Mulvaney & Carpenter, LLP) of the New York bar, admitted pro hac vice, on the brief).

The opinion of the court was delivered by

GUMMER, J.A.D.

This case involves the purported settlement of litigation challenging the constitutionality of the Casino Property Tax Stabilization Act (CPTSA or Act), N.J.S.A. 52:27BBBB-18 to -28. The parties memorialized that settlement in a 2018 consent order. The Legislature amended the Act in 2021. L. 2021, c. 315 (2021 amendment or Amendment). By way of an order to show cause, respondents sought to enjoin the enactment of the Amendment, contending it violated the 2018 consent order. The trial court did not issue an injunction but instead entered separate orders, finding the Amendment was a violation of the consent order, denying a reconsideration motion, requiring certain payments be made to Atlantic County, and awarding plaintiffs attorneys' fees. The State and Governor Philip D. Murphy appeal from each of those orders. Because a disputed term in the parties' settlement agreement is ambiguous and because the trial court failed to resolve the ambiguity by conducting a plenary hearing, we

vacate the orders and remand the case for proceedings consistent with this opinion.

I.

In 2016, the Legislature enacted the CPTSA, which established a ten-year "payment in lieu of taxes" (PILOT) program for casino gaming properties located in Atlantic City. The CPTSA was proposed in response to Atlantic City's "dire situation" and "fiscal challenges," which arose in part from casino closures and the "large property tax refunds" Atlantic City owed to the casinos that had successfully appealed their property tax assessments. Sponsor's Statement to S. 1715 (Feb. 29, 2016); see also Marina Dist. Dev. Co. v. City of Atl. City, 27 N.J. Tax 469, 476-77 (Tax 2013), aff'd o.b., 28 N.J. Tax 568 (App. Div. 2015). The Legislature declared the Act served a public purpose "because Atlantic City w[ould] be able to depend on a certain level of revenue from casino gaming properties each year, making the local property tax rate and need for State aid less volatile." N.J.S.A. 52:27BBBB-19(m).

The casinos' "gross gaming revenue" (GGR) was one of the criteria used to calculate the annual PILOT payments. N.J.S.A. 52:27BBBB-20(c)(4). The Legislature in the CPTSA defined GGR as "the total amount of revenue raised through casino gaming from all of the casino gaming properties located in

Atlantic City," as determined by the Division of Gaming Enforcement. N.J.S.A. 52:27BBBB-20(a) (2016). In 2018, the Legislature passed a law that authorized sports wagering at casinos and racetracks, L. 2018, c. 33. See also N.J.S.A. 5:12A-10 to -19 (the Sports Wagering Act). With the passage of that law, the Legislature also amended the definition of GGR to include "revenue from sports pool operations," effective June 11, 2018. L. 2018, c. 33, § 14; see also N.J.S.A. 52:27BBBB-20(a) (2018).

In 2016, Liberty & Prosperity 1776 Inc. (L&P) and three residents and taxpayers of Atlantic County filed suit against the City of Atlantic City, its mayor, the State of New Jersey, the Local Finance Board of the State of New Jersey, and the director of the Division of Local Government Services of the State's Department of Community Affairs, challenging the legality of the CPTSA. The parties did not include a copy of that complaint in the appellate record. We take that description from the memorandum of decision entered by the trial court with its July 29, 2022 order.

On June 19, 2017, Atlantic County and five municipalities located in Atlantic County filed a complaint (the County action) against the State and others seeking a judgment declaring the Act null, void, and of no force or effect and unconstitutional under the Uniformity Clause set forth in Article VIII,

6

Section 1, Paragraph 1 of the New Jersey Constitution and under Article IV, Section VII, Paragraph 9(6) of the Constitution. They also sought to enjoin defendants from implementing or enforcing the Act.

In their complaint, plaintiffs in the County action asserted Atlantic County and Atlantic City, through their designated representatives, had entered into "an intergovernmental contract" on January 14, 2015, that provided the County would "receive 13.5% of any PILOT payment that might be received by Atlantic City from the City's casino gaming property owners . . . ." They complained the Act did not include the County's purported right to receive those funds but instead "vest[ed] the Local Finance Board with unfettered 'discretion' to determine the amount of PILOT payments and other payments to be remitted by Atlantic City to the County." They alleged the Atlantic City manager had advised the County it would receive only 10.4% of the PILOT payments.

The parties resolved their dispute during a settlement conference conducted by the assignment judge on April 20, 2018, and, through their counsel, placed the terms of the settlement agreement on the record that day. The terms provided that for 2019 through 2024, "the County will be provided with 13.5% of whatever the aggregate PILOT payment happens to be under the statute for each year" while providing some services to Atlantic City and for

 A-0420-22

2025 and 2026, the County would receive a "12% share" without having to provide services to the City. In a discussion regarding the parties' ability to enforce the agreement, counsel for L&P raised the issue of "the State Constitution prohibit[ing] present people from binding future legislation." The judge noted that incorporating the settlement agreement in a court order "would allow . . . for [an] enforcing mechanism."

The parties memorialized the settlement in a June 18, 2018 "consent order for settlement." In that consent order, the parties defined "Aggregate Pilot Payment" as "the aggregate payment received, in a particular year, by Atlantic City from the Atlantic City casinos pursuant to and under the Casino Property Tax Stabilization Act, N.J.S.A. 52:27BBBB-18 et seq."; the "County Pilot Allocation" as "the County's share of the Aggregate Pilot Payment"; and "County Services" as "services . . . , as agreed to by the County and the State and/or City, assumed and provided by the County for Atlantic City taxpayers resulting in the City of Atlantic City saving the cost the City would have incurred had the City been the direct provider of those services." The parties did not define or reference GGR in the consent order.

In the consent order, the parties incorporated by reference the settlement placed on the record on April 20, 2018. The consent order specifically provided

that "[f]or tax years 2019 through and including 2024, the County P[ILOT] Allocation shall be . . . calculated at 13.5% of the Aggregate Pilot Payment in return for which the County will provide County Services . . . ." For the 2025 and 2026 tax years, the consent order provided "the County Pilot Allocation shall be twelve percent (12%) of the Aggregate Pilot Payment." The consent order dismissed with prejudice the claims made by the County plaintiffs and without prejudice the claims made by the L&P plaintiffs. The consent order did not specify an enforcement mechanism and did not address whether or how subsequent legislative developments would impact the parties' agreement.

In 2021, the Legislature amended the CPTSA, effective December 21, 2021. L. 2021, c. 315. In amending the CPTSA, the Legislature found the CPTSA had had a "stabilizing effect . . . on the finances of . . . Atlantic City and the casino gaming industry during the first five years of the law." N.J.S.A. 52:27BBBB-19.1(c). According to the Legislature, "Atlantic City's overall financial condition [was] more stable since the casino gaming properties began making PILOT payments" and that "financial stability benefit[ed] the casinos, their employees, property taxpayers in Atlantic City, and all New Jersey residents." Ibid. The Legislature, however, expressed concern that the financial stability might be "adversely impacted by certain provisions in the [then] current

A-0420-22

version of the" CPTSA. N.J.S.A. 52:27BBBB-19.1(d). The Legislature specifically referenced, among other things, the calculation of the annual PILOT payment. N.J.S.A. 52:27BBBB-19.1(d).

In the 2021 amendment, the Legislature, among other adjustments, redefined GGR for 2021 through 2026, adding this sentence to its definition: "For the purpose of determining the amount of the [PILOT] pursuant to this section, gross gaming revenue shall not include revenue derived from Internet casino gaming and Internet sports wagering during calendar years 2021 through 2026 as determined by the" Division of Gaming Enforcement. N.J.S.A. 52:27BBBB-20(a). The Legislature also reset and reduced the casinos' aggregate PILOT obligation to $110 million for 2022 and between $100 and $120 million for 2023 through 2026, subject to two percent annual increases under certain circumstances. N.J.S.A. 52:27BBBB-20(c)(3)(e)-(h).

On December 21, 2021, plaintiffs in the County action filed an application for an order to show cause seeking an order enjoining defendants from taking any action to enact or implement the provisions of the Senate and Assembly bills regarding the 2021 amendment to the CPTSA. In an accompanying certification, Atlantic County's County Executive asserted the Amendment would have the effect of reducing the casinos' Aggregate PILOT Payment and that reduction

would "violate the [c]onsent [o]rder by reducing Atlantic County's share of the Aggregate Pilot Payment . . . ."  The court entered the order to show cause the next day, scheduling a hearing for February 8, 2022.  The court also issued a letter, stating plaintiffs' counsel had advised the court the Governor had signed the legislation the prior evening and advising the parties plaintiffs' allegation the State had violated the June 18, 2018 consent order "can be addressed" at the scheduled hearing.

After hearing argument, the court on February 25, 2022, entered an order finding the State had violated the terms of the consent order, declining to enjoin defendants from implementing the 2021 amendment "except to the extent they are subject to sanctions and/or damages," and scheduling a hearing "on the remainder of [p]laintiffs' application for relief regarding sanctions and/or damages against [d]efendants as may be necessary, proper, and appropriate as a result of the violation" of the consent order.

In a written opinion, the court explained its view that "the key issue to be decided in this application [was] whether there was a breach" of the consent order and its decision to view plaintiffs' order to show cause seeking an injunction "as an application to enforce a settlement agreement or an application to enforce litigants' rights under Rule 1:10-3."  The court found defendants had

11

breached the consent order. While acknowledging "the State can generally amend a statute to address market conditions that have arisen since the passage of the initial legislation and to protect various stakeholders," the court rejected defendants' arguments because under those arguments defendants "could have entered into the agreement with [p]laintiffs . . . and immediately thereafter amended the definition of [GGR] and thereby dramatically impacted the amount the County would receive under the settlement agreement."

The court found "it was not the intention of the parties, as set forth in the settlement agreement, to permit [d]efendants to unilaterally change the definition of [GGR] so as to fundamentally alter the agreement and the reasonable expectations of the parties." The court noted the definition of Aggregate Pilot Payment in the consent order included a cite to the CPTSA but did not include after that cite the following language: "as the Act may be amended from time to time at the sole discretion of the State of New Jersey." The court concluded that it was not enjoining the parties from implementing the 2021 amendment but would address later plaintiffs' remedy for the breach of the consent order.

The court denied defendants' subsequent reconsideration motion on May 2, 2022. On May 16, 2022, the court conducted a case management conference

concerning plaintiffs' application for damages and sanctions based on the court's finding defendants had breached the consent order.

After hearing argument, the court entered an order on July 29, 2022, requiring "[d]efendant" to pay the County $2,362,500 within five days of the order; the two remaining quarterly payments of $5,568,750 for the year 2022 on August 15, 2022, and November 15, 2022; and "quarterly payments for the years 2023 through 2026 pursuant to the terms of the [c]onsent [o]rder" with the "amount of PILOT owed to the County" for those years being "calculated by (1) applying the terms of the 2018 [c]onsent [o]rder, (2) applying the provisions of the Act prior to the Amendment, and (3) calculating [GGR] to include internet gaming and internet sports wagering revenue." The court directed plaintiffs to submit a fee application and denied plaintiffs' request for compound daily interest and compensation for County employees.

In a written opinion, the court found defendants had to "remit the award shortfall amount to the County," specifically "a portion of the PILOT to the County in accordance with the mathematical formula as set forth in the [c]onsent [o]rder and in accordance with the provisions of the 2016 Act . . . and the pre-amendment definition of GGR . . . ." Finding the February 25, 2022 order had put defendants on notice they would be held "liable not only for damages

13

resulting from the breach, but also for sanctions," the court held defendants had willfully violated the court's February 25, 2022 and May 2, 2022 orders by making on May 15, 2022, a "deficient payment to the County (pursuant to the Amendment instead of the [c]onsent [o]rder)." Based on its conclusion "the State made a 'calculated decision' to willfully violate multiple [c]ourt [o]rders when they [sic] issued the deficient May 15, 2022 payment," the court awarded plaintiffs attorneys' fees and costs "associated with this action incurred on or after May 15, 2022."

In an August 23, 2022 order and opinion, the court awarded plaintiffs $176,045.63 in attorneys' fees and costs. On August 29, 2022, the court stayed its July 29, 2022 and August 22, 2022 orders.

On the same day it issued the stay of the orders in this case, the trial court entered an order and opinion in <u>Liberty & Prosperity 1776, Inc. v. State</u>, No. ATL-L-170-22 (Law Div. Aug. 29, 2022), in which the court held the Act was constitutional, but the 2021 amendment was not. (Slip op. at 39). We have since affirmed the aspect of the order finding the Act constitutional and reversed the aspect finding the 2021 amendment unconstitutional. <u>Liberty & Prosperity 1776, Inc. v. State</u>, No. A-0487-22 (App. Div. Oct. 21, 2024).

Defendants State of New Jersey and Governor Philip D. Murphy appeal from the February 25, May 2, July 29, and August 23, 2022 orders. They argue the trial court erred in finding the 2021 Amendment was a breach of the consent order based on the terms of the consent order, contract law, and the unmistakability doctrine; the July 29 and August 23, 2022 orders were not supported by law or the record; and the court erroneously required a duplicative payment in its July 29, 2022 order. Because the court failed to consider or resolve the ambiguous nature of the parties' agreement and decided issues of intent without conducting a plenary hearing, we vacate the orders and remand for proceedings consistent with this opinion.

## II.

"'A settlement agreement between parties to a lawsuit is a contract' . . . 'governed by [the general] principles of contract law.'" Savage v. Twp. of Neptune, 472 N.J. Super. 291, 305 (App. Div. 2022) (first quoting Nolan v Lee Ho, 120 N.J. 465, 472 (1990); then quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (alteration in original)). "[C]ontract interpretation is . . . 'subject to de novo review by an appellate court.'" Boyle v. Huff, 257 N.J. 468, 477 (2024) (quoting Kieffer v. Best Buy, 205 N.J. 213, 222 (2011)). "Thus, '[w]e accord no special deference to the trial court's . . . interpretive analysis and

look at the contract with fresh eyes.'" Ibid. (quoting GMAC Mortg., LLC v. Willoughby, 230 N.J. 172, 183 (2017) (internal quotation marks omitted)).

"A court's objective in construing a contract is to determine the intent of the parties." Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 320 (2019). "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020) (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). "The court's role is to consider the agreement's terms 'in the context of the circumstances under which it was written,' 'accord to the language a rational meaning in keeping with the expressed general purpose[,]' and apply the agreement accordingly." Accounteks.Net v. CKR Law, LLP, 475 N.J. Super. 493, 504 (App. Div. 2023) (alteration in original) (quoting Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 269 (2006)). The "court's task [i]s 'not to rewrite a contract for the parties better than or different from the one they wrote for themselves.'" Globe Motor Co., 225 N.J. at 483 (quoting Kieffer, 205 N.J. at 223). "To the extent that there is any ambiguity in the expression of the terms of a settlement agreement, a hearing may be necessary to discern the intent of

16

the parties at the time the agreement was entered and to implement that intent." Quinn, 225 N.J. at 45.

"A contract is ambiguous if its terms are 'susceptible to at least two reasonable alternative interpretations.'" Capparelli v. Lopatin, 459 N.J. Super. 584, 604 (App. Div. 2019) (quoting Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997)). "When a contract is ambiguous in a material respect, the parties must be given the opportunity to illuminate the contract's meaning through the submission of extrinsic evidence." Ibid. "If an ambiguity exists, then resolution of the document's intended meaning is a fact issue." In re Trust of Nelson, 454 N.J. Super. 151, 161 (App. Div. 2018). "Disputes of material fact should not be resolved on the basis of certifications . . . ." Palmieri v. Palmieri, 388 N.J. Super. 562, 564 (App. Div. 2006). Presented with a fact issue, "the court must conduct an evidentiary hearing." In re Trust of Nelson, 454 N.J. Super. at 163.

Because an essential term of the parties' settlement agreement was ambiguous, the trial court erred in finding defendants had breached the consent order without first conducting a plenary hearing to resolve that ambiguity and determine the parties' intent. In the consent order, the parties defined "Aggregate Pilot Payment" as "the aggregate payment received, in a particular

17

year, by Atlantic City from the Atlantic City casinos pursuant to and under the Casino Property Tax Stabilization Act, N.J.S.A. 52:27BBBB-18 et seq." The parties didn't state, one way or the other, whether that definition referenced only the current version of the Act or subsequent versions. The court noted the definition of Aggregate Pilot Payment in the consent order did not include language specifying that "the Act may be amended from time to time at the sole discretion of the State of New Jersey." But the definition also did not include language specifying that it was limited to the current version of the Act and did not encompass any subsequent versions. And the agreement placed on the record on April 20, 2018, equally lacks clarity. When asked by the court to provide the terms of the settlement, counsel for the State answered, "for 2019 through and including 2024, . . . the County will be provided with 13.5% of whatever the Aggregate Pilot Payment happens to be under the statute for each year." (Emphasis added). Counsel did not say – as plaintiffs incorrectly assert in their brief – that amount would be "computed based on the . . . Act that existed that day."

The trial court did not resolve that ambiguity surrounding the definition of Aggregate Pilot Payment by conducting a plenary hearing. Without resolving that ambiguity, the trial court could not determine the parties' intent and

whether, in fact, that parties had reached a mutual agreement. See Cumberland Farms, Inc. v. N.J. Dep't Env't Prot., 447 N.J. Super. 423, 438-39 (App. Div. 2016) ("[u]nless there is 'an agreement to the essential terms' by the parties, however, there is no settlement in the first instance" (quoting Mosley v. Femina Fashions Inc., 356 N.J. Super. 118, 126 (App. Div. 2002))). Accordingly, we vacate the February 25, 2022 order and the subsequent orders under appeal, which were based on the breach found in that order, and remand, directing the trial court to conduct an evidentiary hearing to resolve that ambiguity and determine the parties' intent.

Defendants argue the trial court's finding of a breach was also precluded by the "unmistakability doctrine." We are not persuaded by that argument. The New Jersey Supreme Court addressed the unmistakability doctrine in Berg v. Christie, 225 N.J. 245 (2016), a case in which the Court considered whether the legislative suspension of State pension cost-of-living adjustments "contravened a term of the contract right granted under the earlier enacted 'non-forfeitable right' statute," id. at 252 (citing N.J.S.A. 43:3C-9.5), and whether "the Legislature [must] express unequivocal intent to contract" to overcome "the general presumption against finding a contract that is created by a statute," id. at 260. The Court cited Spina v. Consolidated Police and Firemen's Fund

Commission, 41 N.J. 391, 404-05 (1964), in which the "Court acknowledged that the Legislature could, if it wished, impose contractual obligations on itself . . . [b]ut to do so, the Court required a high bar for the creation of contracts by statute because contractual language in a statute cuts off the legislative prerogative to revisit policy choices." Berg, 225 N.J. at 260-61 (citing Spina, 41 N.J. at 404-05). The Court held "[b]ecause the Legislature cedes significant sovereign power by the creation of a legislative contract, the clear indication, or unmistakability, standard is designed to prevent that power from being yielded too easily." Id. at 264. Even considering defendants' circuitous analysis of the United States Supreme Court's plurality opinion in United States v. Winstar Corp., 518 U.S. 839 (1996), we are not convinced that the unmistakability doctrine, which as analyzed by the Court in Berg, 225 N.J. at 261, clearly applies to the Legislature's decision to "impose contractual obligations on itself" through statutory contracts, equally applies to an agreement of limited temporal scope into which the State freely entered to resolve pending litigation.

Because we vacate the February 25, 2022 order, we do not reach the parties' substantive arguments regarding the July 29 and August 23, 2022 orders, which were premised on the February 25, 2022 order.

Given that the motion judge considered this matter in multiple sequential orders, we respectfully deem it most prudent to have the case on remand reassigned to a different judge who can approach the matter from a fresh perspective. See Graziano v. Grant, 326 N.J. Super. 328, 349 (App. Div. 1999) (stating the power to remand a case to a different judge "may be exercised when there is a concern that the trial judge has a potential commitment to his or her prior findings."); see also Freedman v. Freedman, 474 N.J. Super. 291, 308 (App. Div. 2023) (remanding a matter to a different judge as the same judge "may have a commitment to [his or] her prior findings").

Vacated and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0420-22